Dennis Reardon for defendant Namvar. There are numerous issues in this case we're not going to reach all of them today. The counsel for Mr. Tabatabai will cover several and we join in those arguments. I am going to focus on the issues, insufficiency and instructional claims, that rest on the and your honors I submit to you that this is this case is a big deal because the government is asking you to disapprove the form instruction on wire fraud and mail fraud of the Ninth Circuit. That form instruction is based on Woods. We embrace it. They attack it. They take a specific intent instruction. No, your honor. I'm referring to the aspect of the instruction where which in this case the government asked for and the district court omitted from the definition of wire fraud any reference to a false statement or an omission of fact. In the Ninth Circuit form instruction it talks about a scheme to defraud or to obtain money or property by false statements or material omissions. In other words the scheme itself was the argument of the government was defraudulent scheme. Right. Am I right? That's right, your honor. However, they say to the district court and they say to you, strike from the Ninth Circuit form instruction any reference to statements or omissions of fact. The jury was never told that there had to be a false statement or an omission of material fact. Well, but it seems to me that we have often approved instructions that are a form instruction where the facts or the theory of the case make a variance appropriate. So the mere fact that it doesn't follow the instruction that's in the form book is not the end of the conversation. It is not, your honor. The end of the conversation is what Judge Kaczynski said in the Bush case. The government seems to have left out an important element of fraud, namely fraud. The United States Supreme Court has always defined fraud as involving a material misrepresentation of fact or an omission of a material fact. That is what Bush said. The government in that case there was no omission of fact. There was no material misstatement of fact. The jury has to be instructed and the form instruction requires it that fraud involve a statement, a statement of or omission of material fact. Now, when it's true... One of the issues, one of the problems I have with your client in particular, she's been in this business for a long, long time. The statute itself refers to safekeeping of the funds that are held to avoid capital gains taxes. And at least as to one particular account, maybe two, but there was one where these people said, we don't like the bank it's in. I want it in a different bank. And it was put into, I don't know, Wells Fargo Bank or one of the national banks. And then the money was immediately transferred out to be used by your client in this real estate game. And one of the things that bothers me about your client's activities is that it was in effect a modified Ponzi scheme because what he did was get the money from people, keep coming in. And the difference was he wasn't dissipating all the money, although he did use some of it for his own, but he had it in this other real estate business, which we recognize, or at least the file recognizes, that up until the disaster struck mortgages in this country, it had a balance sheet that was very favorable. But, Your Honor, you would agree that, number one, the misstatements that you refer to came after the money was transferred into the account. So if he didn't lie to those people beforehand, if there was any dishonesty afterwards, it would have to be a different event. But isn't it a... The misstatements which indicated that he knew that this was wrong. But we... I realize those were afterwards, but those are admissions which the jury can consider. I'm not saying that they were inadmissible, Your Honor. But what we are saying is that the law of this circuit, Bush, the law of the United States Supreme Court, says there must be a misrepresentation of fact or an admission of a material fact. And Woods... I'm sorry. I'm looking at this U.S. v. Omer case, which says, in Woods, we held that proof of a scheme or artifice to defraud does not require the proof of making any specific false statement, and then goes on to say that you need to show that there's materiality. What do we make of that? Well, let me explain that, Your Honor, because this is critical. This comes out of Woods. In Woods, if this jury had been instructed the way it was, in Woods the judge instructed you have to have a material misrepresentation of fact or an omission of fact. The defendant said, oh, it has to be specific. And the Ninth Circuit, you know, somebody's selling land and this was the fact pattern. But, Counsel, Omer went beyond that. It said it is the materiality of the scheme or artifice that must be alleged. The materiality of a specific statement need not be pleaded. Your Honor, the case... So it's the case. Excuse me. Here the instruction tracked that thought, that it's the scheme or artifice that must be material, and that that's what has to be proved. This Court has never approved a conviction in which the jury was instructed that there didn't have to be a statement or an omission of fact. The key word there, Your Honor, is the word specific. In Woods, they said you need a misrepresentation of fact or an omission of fact. The defendant said, oh, it has to be specific. And this Court said, no, it can be half-truths, it can be context, it can be circumstance. Well, what do you make of it is the materiality of the scheme or artifice that must be alleged? That's what was said in the instructions here. But there was no statement in the instruction in this Court. Your Honor, this will be the first Court that ever approves a concept of fraud without a statement or an omission of fact. It's in the form instruction, it was in Woods, it was in Lyons, it's everywhere except in this case. Now, what all those cases stand for is you don't need a great level of specificity. If someone came and said, is there land on this piece of property I want to buy? Where's the well? And somebody points and then says, don't worry about everything, everything's fine. There might not be a specific force. What if they only point and they say nothing? Does that count as a statement? Absolutely. Conduct can be statements if the jury finds it. But a jury in that case, as was true in Woods, this is the fact pattern in Woods, was instructed that they had to find a material omission of fact. Look at the discussion in Woods of the instructions given in the district court. And if we got them, we wouldn't be here complaining. They're the ones we asked for. The instructions given there were that you have to find a material, the statement of fact, and that then the court went on, and this is what the defendant was complaining about, to say it doesn't have to be specific false statements. This is the instruction to the district court approved by this court. The arrangement of the words or the circumstances in which they are used may create an appearance which is false. Excuse me. I need to stop you because you don't take a breath, but I do have another question. Okay. I want to go to the statute, to Section 1343. And it seems to have two alternatives. Whoever having devised or intending to devise any scheme or artifice, that is an alternative under the statute to a false statement or promise. And I wonder if you could comment on whether you view the statute as allowing a scheme or artifice to be used as an alternative to a false   statement. Well, without any false statement or any omission of a material fact, Your Honor, I rest on the interpretation of that statute by the United States Supreme Court in Nieder and in Durland. And this Court in Woods said it was relying on Durland where the Supreme Court construed the mail fraud statute, and I'm quoting from page 99, to include everything designed to defraud by representations as to the past or present or suggestions and promises as to the future. But we said in Nieder, in Omer again, Nieder did not undermine this non-technical standard for measuring fraud, which does not require proof of a specific false statement. Your Honor, the key word there is specific. This all comes from Woods. And in Woods, the court said, the district court said you have to have a material misrepresentation or omission of fact. They were instructed in that way. The defendant said, oh, no, they didn't leave out the magic word specific. And the court said, no, it can be nonspecific and still be deceitful. But it never suggested, there never has been a case in which the jury below, they admitted the facts or the misrepresentation or omissions requirement. This is it. This is the first one. One question. What was the charge, the indictment? How was it put? In a general statement of a fraudulent scheme or was it put into a specific statement that there were omissions of fact? It contained all of that language. It contained, in fact Was it either or or was it just one way? It contained I'll look it up. No, it contained both. It said a scheme to defraud, to obtain money or property by misrepresentations. And Your Honor, the government, and this is in our ER, proposed an instruction saying that it had to prove that there were material misrepresentations. But counsel, don't we have a lot of cases that say when an indictment charges you have committed this crime by means of A and B, but either one suffices, that we interpret that to mean that either A or B, if proved, will suffice? But Your Honor Is that a yes or a no? Can I clarify? You have an answer. No, you're absolutely correct. Okay. The point is you could have two alternative theories. Correct. And one alternative theory is devised, participated and executed a scheme to defraud with the correct mens rea and did these other things under the statute. Here's the problem, Your Honor. In Lyons, your decision in Lyons 472, Fed 3rd, 1055, the jury was instructed that there had to be false promises or statements as applying to either prong of those two prongs. The defendants argued there had to be, I'm sorry, unanimity on one prong or the other. This court said there really aren't two. It said the defendants are drawing a false dichotomy between a scheme to defraud and a false promises theory. This is at page 1068. They essentially said that both of them involve schemes for obtaining money or property by means of false or fraudulent pretences. Your Honor, what the government is saying is that the United States Supreme Court says the settled meaning of fraud is false statements or omissions of material fact. The government is saying we want you to adopt a definition of fraud under which we never have to prove that because we can always go under this umbrella scheme to defraud which doesn't contain that. Counsel, we understand your position and you've done it substantially over your time. Perhaps I could have a few seconds for rebuttal if necessary. We'll give you a minute for rebuttal. Thank you. We'll hear from the government. Good morning, Jean-Claude André, on behalf of the United States. Mr. Reardon says that we are asking you. What is your name? Jean-Claude André. Mr. Reardon says that we are asking this court to, I guess, throughout the Ninth Circuit's model instructions, what's really going on here is that Mr. Reardon is asking this court to throw out the O'Malley instruction, section 4707, which the district court's juror instructions tracked perfectly and at least six cases by my count that have approved of exactly the kind of instructing that went on here. Omer, as you noted, Judge Ikuto, which was a case that although we didn't cite in our brief, we did cite to the district court when we asked for the instruction that the court gave. Woods, which we've discussed quite a bit. Halbert, Bohonas, Beecroft, and Lustiger. Well, I'm reading, I think, either from the record or in your brief somewhere, you referred to the requirement of the government to prove a false statement of some sort. And the argument here is even if it's a scheme, you have to include that there's falsity in some way in the instruction. And we did have in the instruction the requirement that it be false, that the scheme be intended to deceive or cheat, and that the scheme be material. Then that was your requested instruction, but the court didn't give that, did it? No, the court did. The court gave our requested instruction. Okay. And this Court time and again has said that the intent to deceive or cheat is the same as fraud. I think it comes up most frequently in the Section 371 conspiracy to defraud the United States context. That's an intent instruction. Yes. But what we've got here is a question of a statement instruction, whether, you know, there must be some sort of statement, whether explicit or implicit or something, but that the broad statute requires that sort of instruction. We have some cases that says it doesn't require that sort of instruction. Yes, Judge Bright. The six cases that I mentioned, Omer, Woods, Halbert, Bohonas, Heecroft. They're all in your brief? Lustiger. Yes, they are. And I want to address defense counsel's statement that Bush somehow, that we're also asking this Court to do exactly what Judge Kaczynski, Chief Judge Kaczynski warned about in Bush, in asking the Court to uphold a fraud where there's no fraud. The statement of Chief Judge Kaczynski in Bush was dicta, and I realize that there's a high hurdle to establish dicta in this Court. But that's because the reason there was no fraud in Bush was because the union billing in that case was actually legitimate. It had nothing to do with the instruction. It had to do with whether the government actually provided sufficient evidence of the fraud. That's a separate question from the question we're discussing right here. With respect to defense counsel's invocation of Lyons, I don't think that Lyons somehow has melded together the two alternative methods that you can prove fraud, as Judge Graber pointed out by walking defense counsel through the statute. Lyons was really a unanimity case. And, of course, under the Supreme Court's cases like Shad v. Arizona, United States v. Richardson, Supreme Court's made clear, and Lyons is a case that follows along that line, that you can satisfy an element or prove a crime through any one of a number of different brute acts. The jury doesn't have to be unanimous as to which set of brute acts satisfy an element. And I think that's what Lyons was talking about when it was saying that you don't have to divide out or parse out or have the jury be unanimous on whether it was a scheme or a misstatement, because six jurors could agree on one, six could agree on the other, and consistently Shad and Richardson were there. Well, one of the things is, if I understand the claim here, is the charge, indictment charged in the alternative, both misrepresentation and the scheme. And so you could prove either one. But there was, and this is not brought up, but, you know, there was a lot of evidence about, whether it's valid or not is not what I'm concerned with, but there was evidence and offers of evidence that even asked to Neldenweyer that he thought everything was okay in the way in which he proceeded, except maybe as to one charge. And so if he made those contentions, wasn't the judge obligated to instruct both as to misrepresentation and the scheme itself? No, we don't think so. And I'll start, I guess, with the beginning of your question. You're correct. We did charge in the conjunctive both, well, the scheme as established by material false and fraudulent pretenses, representations, promises, and the concealment of material facts. And that's on excerpt page 24. We elected to proceed on a scheme theory, and we used omissions and falsehoods as evidence of the scheme. And defendant was free to, and in fact did, introduce evidence to establish that there weren't fraudulent misrepresentations or he didn't believe them to be false. And then the parties were free to argue that whether that established the scheme or not. The Court wasn't required, however, to instruct on both theories once the government elected to proceed with just the scheme theory. Had we elected to proceed with both theories, then the Court probably would have had to instruct. And then Ben Lyons would kick in and say, and you don't even need a specific anonymity instruction there. Well, what I'm saying is you're talking about election, and I'm talking about a record. And there's a difference somehow. And my view is if you got the evidence in the record on the alternatives, and you pleaded those alternatives, and the judge doesn't give an instruction which covers the evidence, there could be and may be some prejudice. The judge did not preclude the jury from considering any of the evidence related to specific misrepresentations. I mean, that was all fair play. Well, in a sense, that would be beneficial to the defense. Because if there is evidence of two ways to be convicted, and the instructions permit conviction on only one of the two ways, isn't that helpful to the defense rather than harmful? Well, right. And that's presumably why. I mean, I was in trial counsel. That's presumably why the defendants did not object to the government narrowing the charge. We dismissed one count, and we made an election to proceed on just the scheme theory. And the defendants all said that's fine, because it basically made it tougher for us by only giving us one avenue to prove our case. Does that acquiescence have any bearing on the argument about the instruction that comes later? It's a good question. I wouldn't be comfortable taking the position that it does, I guess, because the defendants did preserve their request for the instruction. And so, you know, parties are free to change their minds so long as they're still before the district court and the other side has an opportunity to address it. That all happened here. So I don't think that their acquiescence to the election, you know, results in, you know, a waiver in the Laurenti sense or even plainer. I wouldn't even advocate that. I think under normal review, though, we're fine here, because the court's instruction did cover the charge. I would like to address one other, I guess, nuance, though, perhaps, or offer one other nuance in response to your questions, Judge Breyer. When we narrowed the charge here, we actually proposed to the court a narrowed indictment, and the court ordered that that be the trial indictment. Now, the indictment didn't go back to the jury, but it was read to the jury. And tellingly, and this is on excerpt page 33, that indictment then just talked about the scheme to defraud as to material matters. It carved out the second set of allegations, you know, through material and false representations. So I guess to the extent that you were at all concerned about a variance in some of your questions. And is that instruction, the instruction that applied to the co-defendant Tabbabadi, too? The indictment, the redacted indictment? No, the scheme issue. Yes. It's a common issue. There wasn't any special instruction as to Mr. Tabbababi. I don't know how to pronounce it. Tabbababi? No, there wasn't. They were treated similarly. That's fine. That's what I wanted to know. If the Court has no further questions, I'm happy to sit down. You may do so. Thank you. Mr. Rudin, you have one minute. Very quickly. The government may have given the Court the impression that the instruction given to the jury contained the word false or falsehood. It does not. It's quoted on page 30 of our brief. Judge Graber, you asked the question, if you have a form of instruction with different theories in it and one proves irrelevant, can you strike it? Of course. But you can't strike out of a form of instruction an element of offense. And I propose to you, if you look at this Court's form of instruction, element number two, it says that statements or omissions, their materiality, that requirement referenced the statement of omissions is to both the scheme to the fraud and to the misrepresentation theory. So the present instruction has as an element that, as to both theories, and this Court, if it approves this instruction, would be striking an element, in our view, of the offense. How about the six cases? It decides to support its position. They're all the same thing. And let me just be crystal clear on this. We did not request and are not arguing that a specific misrepresentation is required. We want the instructions that Woods approved. We want the instructions that Lyons approved. All of those cases contain references to statements or omissions. This case does not. And so we are not arguing. We embrace the notion that there doesn't have to be a specific misrepresentation. But as Woods says, it can be circumstances, it can be context, but it distinguishes in footnote three the G case from the Seventh Circuit because it says in that case there were no misrepresentations. Unlike here, and there are 12 misrepresentations in Woods of different kinds. Thank you, counsel. You have exceeded your time. Just ten seconds on one point, Your Honor. Very quickly. The government conceded they relied on an omissions theory under their fraud theory. If they relied on an omissions theory, then we were entitled to the Dowling instruction, which defines what kind of omissions qualify, which is under the duty to disclose. We understand your position on that. Thank you. It was thoroughly briefed. Thank you. All right. So the United States v. Nonvar is now submitted, and that half. And we will hear now about Mr. Tabatabai. I think that is the pronunciation? It is, Your Honor. May it please the Court, my name is James Fergus. I represent Mr. Tabatabai, and I represented him in the trial proceedings below. And, Your Honor, I'm going to address first the evidentiary issues that were numerous and permeated the trial court below. As you do that, I wonder if you'll help me, because speaking only for myself, I found the evidence as to your client to be skimpy in the extreme. And so I wonder, as you're talking about the evidence, if you would also talk about the error that was made in not sending the exhibits back to the jury, and whether, with respect to your client, that error was harmless or not. Yes, Your Honor. I'm going to start with that point. The error. The other thing I would like to have you cover also, in addition to not sending the that your client was in good faith and thought that the business of taking the money out of the original account and putting it into the real estate account was okay and satisfactory. And, of course, with one of the accounts, he hadn't noticed that these clients did not like the bank and wanted it put in the specific bank, and thereafter it was put in the specific bank, and then the money was taken out and put into the real estate account. Yes. I'll begin with the evidentiary issues, Your Honor. There were so many, but I tried to categorize them into four basic categories of excluded evidence that went directly to Mr. Tabatabai's state of mind. And, yes, even the district court found him to be a minimal participant in the charged scheme. He was a salaried employee who went to work every day for an owner of a billion-dollar real estate empire and simply was the controller. He worked for NCG and served as the controller for NCG and NFE. And he believed, and his defense at trial would have been, that he believed the clients were well aware that their exchange proceeds were managed by NCG, the real estate company, in order to earn interest. The proffered evidence on that, though, went to other clients who were not the clients who were victims in this case, as I understood it. So one of the categories was not allowing any other NFE clients to testify. Mr. Tabatabai had no direct interaction with any of the four clients charged in this case. There were over a thousand exchanges completed during the period of the charged fraud. Mr. Tabatabai was not communicating with any of the four charged clients. I thought there was an e-mail with the Sunny Lane person, Russ. The Sunny Lane e-mail was after the Sunny Lane exchange was set up. There was a time when Larry Russ was having conversations with Nambar, now with Mr. Tabatabai, by e-mail requesting that his funds be held in a different bank. And late in that e-mail exchange, Mr. Nambar e-mailed Mr. Tabatabai, please transfer the funds back and send confirmation that that had happened. And Mr. Tabatabai sent one word back, confirm, because it, in fact, had been done. Now, if we were to conclude, and this is just hypothetical at this point, if we were to conclude that the evidence that was at trial was insufficient with respect to your client, we would never reach any of these evidentiary issues, correct? Correct. Okay. Would you talk about the exhibit problem and the nature of the evidence against your client? Yes. One of the exhibits that was introduced that made its way into the record was exhibit 1116. That was an e-mail exchange between Mr. Tabatabai and the person who ran the exchange business, Val Moroka. She was in charge of that business. And it was written in August 2008, and the e-mail was written after clients began asking that their funds be held in a bank account rather than managed by NCG. Mr. Tabatabai believed that all clients were well aware that their funds were managed by NCG, and as the market began to turn, some clients wanted their funds in a bank, not at NCG. So that August 2008 e-mail established Mr. Tabatabai's innocent state of mind. And I told the jury during closing that that exhibit is a time machine that transports you back to August 2008 to understand Mr. Tabatabai's thinking. I presented that to Ms. Moroka when she was on the stand and the district court would not let her testify about it. She was a lawyer, wasn't she? She was a lawyer. Can you explain? I mean, I looked at the e-mail. Can you explain how it does all that you say it does? I mean, all it says is that NAMCO agrees to hold the proceeds in Wells Fargo, and you'll get Wells Fargo bank rates. Right, because Mr. Tabatabai Well, it names a specific bank account as opposed to the exchange agreement, which just says it will be held in an account. Right, but it's representative of the change in business practices that was occurring in August 2008. As the financial markets were tightening, clients were conversing with Hamid Tabatabai on occasion about not wanting their funds managed by NCG anymore. He couldn't talk about any of that. He took the stand precisely to explain why he believed that all clients knew their funds would be managed by NCG, and example after example of his testimony was excluded. That one exhibit cut crept in. That one exhibit deals with a segregated account at Wells Fargo. But it's after the court's well aware of it. All the times I turn to the district court with various categories of evidence, asking, telling the court that this is the whole ballgame, this is the whole case, and the court said it didn't care, that exhibit crept through. And that exhibit shows an innocent state of mind, because why would you have a form if clients' funds were being held in the way described in that form? Why would there be a form? The government's theory of the case, there were two theories of fraud that the government advanced. It's charged in paragraph 10 of the indictment. And incidentally, the government did not change the scheme theory between the two indictments. The government dismissed one count because it had evidence that that one client knew the funds were managed by NCG. But the paragraph 10 and the preceding paragraph defining the scheme were identical in both indictments. Now, the two theories were that clients were led to believe their funds would be available on demand when Mr. Tabatabai well knew they weren't. And the second theme was that they would be held in a bank account when Mr. Tabatabai knew the funds wouldn't be held in a bank account. And that paragraph 10 is what governed the case. Now, that email showed that for the first time in August 2008, there was talk about holding the funds in a bank account. In a specific bank account. Yes, in a specific bank account. But the exchange agreement, Mr. Tabatabai read and testified about his belief that it permitted transfers by intermediaries. So let's say that the government's case rested just on two pieces of evidence. That Mr. Tabatabai had read the exchange agreement, was familiar with it, and the paragraph that says the money will be held in an account, and the testimony that he knew the money was being wired elsewhere and was being used for investment purposes. And so, of course, the jury can disbelieve Mr. Tabatabai's testimony about his intent. Why, given our low Rule 29 standard, if you have just those two pieces of evidence, why is that not enough for the jury? There's two responses to that. First, I want to focus on the exchange agreement itself. The exchange agreement he signed, Mr. Tabatabai, before it was ever delivered to the client, he just would randomly put together the packets, sign them, and they'd be sent off. He didn't communicate orally with these clients. And the agreement permits the transfers. And the agreement itself is insufficient to support a fraud conviction in this case. Because what's the language? Because it says held in an account. At the direction of intermediary. That paragraph concludes with or transfers as directed by intermediary. It's paragraph 5. So they transferred to any other such general account or accounts as directed by intermediary. So you're saying that that authorized use of the money for investment purposes? It authorized the transfer to NCG. That was the government's theory of the case. And Mr. Tabatabai, who's not a lawyer, did exactly what multiple clients. We had proffered in the courthouse people who would have testified that that paragraph caused them to think the money would be managed by NCG. Val Moraka was not permitted to testify about her understanding of that agreement as the attorney and person who ran the financial exchange company. That was excluded. All that was left was Mr. Tabatabai's reading of that paragraph and the expressed language of the paragraph. And the government's fraud theory for Mr. Tabatabai rests entirely on its, you know, on the signature of that agreement. Now, the fraud theory is not based on the e-mail in August 2008 after the four exchanges were funded by the clients. That's not the government's fraud theory when Mr. Tabatabai wrote the word confirm. As Your Honor indicated, you could have after fraud evidence to confirm that there was a criminal intent at the time the money was deposited in. Well, was the government's theory that, I know they argue it, I think, but at the trial, was it the government's theory that this agreement that was signed with the clients prohibited the money from going into the real estate account or was it an agreement that it was ambiguous? No, the government conceded almost that the agreement wasn't sufficient. The government was not sufficient. That's what I thought, that they had to do more than just rely on the agreement. Right. Both during the hearings on the motions in Lemonade, the government, AUSA Brian Klein, confirmed to the district court that the agreements permitted the transfers. And to the jury, Brian Klein, in rebuttal arguments, said this is not a civil case. You can't look to the expressed language of the agreement alone. That quote from Brian Klein that references this is not a civil case was his effort to focus the jury on other things, like what the money ultimately was spent on by Mr. Nambar. But Mr. Tobias had no control over how money was spent. He wasn't a partner. He didn't have any ability to sign a wire or a check or decide how funds were spent. He was just a salaried employee. I do want to focus on the Mandelbaum evidence as my time runs out because there's also this extremely powerful evidence that Mr. Tobias had an innocent state of mind. And the proffers at Sidebar during that part of the case were candid with the court. The whole case rests on this Mandelbaum evidence. Mr. Mandelbaum was an accountant who sent dozens and dozens of clients to NFE to do exchanges. And he and Mr. Tabatabai routinely talked about the funds being managed by NCG. And Mr. Mandelbaum even sent an e-mail to Mr. Tabatabai related to other clients that expressed a desire that the client funds be invested at the highest possible rate. Well, this is what I was asking you about before because it seemed to me, if I'm remembering this correctly, that the district court relied in part on the fact that these were other clients, not the victims in this case, which limited the relevance. If just because he knew about certain clients doesn't mean that that same information would have been conveyed to the victims here. Right. And the Court's exactly correct. That was the district court's ruling, and that was an error of law. Mr. Tabatabai's state of mind was on trial, not the victim's state of mind. And what Mr. Mandelbaum knew is imputed to his clients. Mr. Mandelbaum handled 100% of the communications with NFE on behalf of most of his clients, including Vasquez, one of the charged clients in this case, and Laska's first exchange, which was in 2005. All communications were handled by Mandelbaum. There's no fraud or intent to trick or cheat if you're telling the agent who you're communicating with on behalf of those clients exactly how the funds are going to be handled. It wasn't something that was secretive in any manner. But by excluding Mandelbaum's knowledge, the district court excluded the defense. It was not a question, the government writes in its answering brief, that the defense was free to discuss with Vasquez that Mandelbaum communicated for her. The critical defense piece was that Mandelbaum knew exactly that the funds were being managed by NCG. And the district court, by categorically excluding Mandelbaum's knowledge from the case, made an error of law, that the knowledge of an agent is not imputed to the principal. And there's a Ninth Circuit instruction, pattern instruction, on that issue in the civil context. Is there any in the criminal context? No, there isn't. Is there any case that upholds that theory in the criminal context you're aware of? That the knowledge of an agent is imputed to the principal? Well, it's all of the cases that support that, like U.S. v. Thomas, that support that a client, a defendant is allowed to put on evidence of his innocent state of mind. And Mandelbaum's knowledge of how the funds were handled, the government's theory is that the clients weren't told that their funds would be managed by NCG. But they were. So you're saying that even if there was not a, let me see if I understand this, even if there's not a matter of law that the agent has his knowledge imputed, that any problem would have been caused by Mandelbaum not communicating to his clients rather than something that your client did? Correct. Did Mandelbaum, was there a proffer that Mandelbaum would testify that he had told the clients here? I guess it was Vasquez was the only current client. There was a detailed proffer. It's in the record at 1925 to 1927 of the relevance of the Mandelbaum evidence. But there was no evidence that Mandelbaum in fact told these clients. But that's exactly your point, it seems to me, that he told Mandelbaum and Mandelbaum didn't bother to tell Vasquez. Right. And Tabatabai is now being charged with defrauding and scheming to trick Vasquez and Laska when in fact he had affirmative evidence that they knew because Mandelbaum knew. The government says that there wasn't evidence that Tabatabai knew that these two people were Mandelbaum's clients. Is that correct? Mr. Tabatabai testified unequivocally that he knew that Vasquez and Laska were Mandelbaum's clients. What the government tries to do is engage in a real subtlety. In 2005, there's no dispute, Laska came to NFE to do an exchange and Mandelbaum handled all the communications 100%. Then Laska came by himself to do a second exchange in 2008, and the government is trying to say, well, he wasn't a Mandelbaum client for the second exchange. But Mr. Tabatabai believed what Laska knew in 2005, he knew in 2008. So, again, we're back to his own state of mind, not whether it's – it doesn't matter whether it was true that Mandelbaum was his agent. It doesn't matter at all. You have exceeded your time, but we'll give you a minute for rebuttal. Thank you, Your Honor. I guess since we're calling these cases separately, I'll announce my appearance again. Jerome Claude-Andre, on behalf of the government, and I do want to point out one housekeeping matter. Mr. Spertus is correct that I misspoke when I told you, Judge Bright, that the scheme allegation in the indictment was narrowed. I was confusing paragraphs 8 and 10, so it stayed the same. But to get to the questions at the heart of the debate we're having now, the evidence was not, in our view, skimpy as to Mr. Tabatabai. He was the controller of both NFE and NCG. He was the only person who was not a member of Nambar's family with full access to both accounts. He signed all, or at least almost all, of the exchange agreements. And contrary to Mr. Spertus' assertion, he did talk to the victims, at least when they came in to sign the exchange. In particular, I'm talking about Vasquez and Laska. And when those signings were made, he did not say, oh, by the way, paragraph 5 allows us to move your money from NFE to NCG. He let them sign the agreements, and they went about their way. Do you agree the exchange agreement is ambiguous as to whether he could, in fact, do that? Not at all, and we did not concede as much in district court. What we conceded in district court was that the money could be moved from one NFE account to another NFE account, which is exactly what the e-mail. I'm sorry. Finish. Which is what the e-mail from Valmaroca with the attached form is all about. I'm sorry. Why isn't paragraph 5 ambiguous? Because it says, because it uses the words such account, or sorry, because it says proceeds will be deposited with other funds in a general account or accounts of NFE with any nationally insured bank or savings institution. So right there we're talking about a legitimate bank where the account is named NFE. And it says may be transferred to any other such general account or accounts by NFE. Moving it to a different entity is not such general account or accounts. And, of course, the final sentence which says that the exchanger shall receive all interest earned on the proceeds on deposit with NFE suggests that it is, again, in a legitimate normal bank account, not that people are taking it and sending it to a different entity and then trading on it. What was said before is so important. This is a criminal case. It's not a civil case. And so we really don't say here's the way we interpret this agreement. The real question to me, is there enough here of ambiguity in the agreement coupled with what was going on and what people often said, yeah, I want the high interest and so forth, so that the government cannot, at least as to Mr. T, cannot rely on the agreement as showing a pattern of fraud when the agreement was not that clear. Well, we think the agreement is sufficiently clear. But if the court disagrees, the good thing is we do have more. We have the lulling email to Russ on August 29th. That seems to me to be really the best evidence you have in my, again, just speaking for myself. I agree. But in view of that being the most damning, if you will, why is the absence of the defense exhibits harmless error with respect to this individual, as distinct from Mr. Namvar, who in my opinion there's a lot more evidence about him? If I could take a very quick detour and then get to your question, Judge Graber. In addition to the lulling email, which I agree with you is our strongest evidence, there are two other salient facts I wanted to hit as far as to kind of set up how sufficient the evidence was. One is that Tabatabai knew that the QuickBooks that were keeping track of the various accounts omitted any mention of the transfers. In other words, those books were cooked, and he knew it, and it was per company policy. Additionally, the verification of fund statements that were sent to the clients never mentioned the transfers. Again, he was familiar with that as well. But taking that as a state of evidence, why was it harmless? It was harmless because the defense exhibits, they weren't that significant, as is often the case in criminal cases where, you know, the defense is to poke holes in the government theory, to cross-examine the government witnesses vigorously. And in particular, defense exhibit 1116, the one that Mr. Spurta says, is so integral. The Russ lulling email, and this is really why I think it's our strongest evidence. The Russ lulling email absolutely destroys defense exhibit 1116, because the Russ lulling email, which we know is a lie, took place on August 29th. Defense exhibit 1116 was August 8th. So for the defense to essentially say, oh, I had this credible belief that paragraph 5 allowed me to move money to NCG, and then this email exchange with Val Marocca in the form that we created confirms that I had that belief, then the lulling mail destroys that. But, you know, that's a great jury argument, and that was an issue for the jury. And in general, we have to look at the evidence in the light most favorable to the government. However, the defense also had a right to have its admitted exhibits in front of the jury to assist it. And so the real question is, is there a reasonable possibility that the jury might have had a different view than you do about the significance of those exhibits in light of the arguments that counsel made? Well, first, I guess I would say it's the defense burden here, not the government's, to show the prejudice. And that's because at every step, the defense agreed. I mean, the defense agreed to the procedure of counsel and the clerk looking at the exhibits. In fact, it's Mr. Spertus who accidentally removed the defense exhibits from the box, and the defense, of course, agreed to the court's instructions. So what you're saying is don't worry yourselves. This will be an ineffective assistance of counsel claim on habeas? I mean, the fact is that the defense exhibits should have gone to the jury. That was a mistake. Yes. Right? And ultimately, that's a mistake by the court, not necessarily by counsel, because it's the court's obligation to see that the exhibits are with the jury. So I'd like you to respond sort of more on the merits to why this couldn't have reasonably been expected to change the jury's calculation. Well, again, assuming that the defense, and this is our position, that the defense bears the burden of showing prejudice as opposed to the government bearing the burden to show harmlessness here. In other words, that we're effectively in a plain error regime because of the defense's agreement with all the steps until Mr. Spertus found the exhibits on his cart. Then he has to disprove what I just said about how the Rusty Mill destroys defense exhibit 1116. And as we pointed out in a footnote in our brief, the other 10 of the 14 defense exhibits were cumulative, meaningless, not in dispute. And moreover, all the exhibits were published to the jury. This is not a case, and we do have judges in our district who do this, where you show a witness an exhibit, you talk about it, you move for its admission, and then you say, oops, I did that too soon because I didn't get to really have the witness talk about the exhibit. The judge says, it's in evidence. Move on, counsel. That's not what happened here. These exhibits were discussed by the defense and, in some cases, by the government. They were published. They were published again in closing argument. The jury, you know, obviously had enough in their mind to know to ask for them when they realized they weren't in the box. And so, you know, for, I guess, for the defense to establish the record. Doesn't their asking kind of help the defense? Because if they want the defense exhibits, it seems to show, well, it could show many things. It could show just that they're compulsive and they want everything. But it could also reasonably show that these exhibits were something they wanted to assist them in their decision-making process. Certainly, but, again, the defense bears the burden to prove that. And what I think actually refutes that suggestion is the fact that the court didn't just give an instruction that says, you have all admitted exhibits. And this is on pages 22, 42 to 22, 43 of the excerpts. The court gave them exhibit numbers and said the government's exhibits start with one. The defense exhibits start with 1,000. So if the jury really wanted the defense exhibits, having just been told something that they know is wrong from the court, but they have a very important cue there, which is the court saying, I'm telling you how to find them. Then they would come back to the court and say, we can find them. So they have to come back a second time? I mean, they went to the court and the court said, no, you have everything. So you're saying that unless they came back a second time? I'm saying that the fact that they asked for them shows some, perhaps shows some interest in them. And defendants have to prove that to establish prejudice. But the fact that they didn't come back. We're not allowed to inquire into the actual thought process of the jury.  We have to infer. And shouldn't we infer from their request that they would like to see them? Yes. Okay. But only so much because then when the court actually says, here's how you find them, they didn't come back and say, we can't find them. Please send another set or please send the clerk in. Nothing like that happened. All the time in criminal cases, we have jurors send back notes repeatedly. You know, can we get a readback? Can we please get a readback? What is Pinkerton liability? Really, we don't understand still. I mean, this is a situation where. We don't either. So let me just ask you this on our precedent. I saw cases in other circuits where there was one missing exhibit and the courts wring their hands about whether it was harmless in that particular case. I have not seen a case where every single defense exhibit was omitted. Is there anything even close to that? Not that I'm aware of, but I guess I'd actually like to address that point because I don't know if the court's seriously considering whether this should be categorized, categorically as a structural error. We, of course, think it shouldn't. But this goes to why structural errors are a very bad figure and I think also will address what might be animating your question, Judge Ikuda. It's very imprecise to just say the defense exhibits didn't go back. All of them, two of them, whatever the quantity. Because as I alluded to a few minutes ago, in many cases, the most important exhibits to the defense are not the defense exhibits. It might just be, you know, a photograph of what the defendant was wearing on the day of the crime and arrest photograph because, you know, it was a burglary at night. And that exhibit, you know, is just not as important as what the undercover agent was wearing when he was talking about it. I mean, there's so many different ways. Even if it's not structural error, though, certainly it's different to have a, you know, it's an inch thick, maybe, of several exhibits. And I know that you dispute their importance. But even under just a harmless error analysis or a prejudice analysis, whichever way you want to phrase it, as distinct from structural error, because I'm sympathetic to your structural error argument, why doesn't the sort of wholesale absence make a difference? Okay. I don't think it matters because, again, you have to look at the quality of the exhibits, whether it's, you know, 13 of 14 that didn't go back or 14 of 14. And so the wholesale absence, I think, we have to drill down, and I realize we have to make some inferences along the way, but we have to drill down and look at how important were these exhibits vis-a-vis the government's exhibits, vis-a-vis the live testimony that the jurors were instructed, you know, that the memory controls over. It's just kind of putting it in a box and saying, you know, because none of the defense exhibits, that's worse than, you know, some subset. It's going to vary case to case based on the total bundle of evidence before the jury. I guess I would like to also address the Mandelbaum evidence, if I could. So in this case, what we had was Mr. Tabatabai testifying in trial, and this is after he sat through Laska and Vasquez's testimony in 2010. He said in the present tense, I know they're Mandelbaum referrals. There is no evidence that he knew in 2008 when these exchanges were done that they were Mandelbaum referrals at the time. There is no evidence in the record that they knew, that he knew in 2005 with the prior Mandelbaum referral that that was actually the case. So we have this bookend of 2010. Then we also have the victims who are saying in 2008 they had no idea that a side arrangement was available or that their money could be moved to NCG. What the defense had to do, and I guess this is where a lot of Judge Anderson's evidentiary rulings come in because I guess just as I'm a plain error hawk, he is a foundation hawk. If you don't lay a foundation for your questions, he's not going to let you ask them. The defense could not lay a foundation either through Moroka's testimony or Moroka or with Tabatabai to establish that bridge, that link, that somehow that Tabatabai believed that what Mandelbaum may have previously known would have been conveyed to the victims and that he kind of trusted that. It was the defense's burden to do that. In fact, it was... Was there evidence either admitted or proffered that Mandelbaum was an agent for the people that he served as an intermediary for, that he was their agent for this purpose? It wasn't disputed that he was a referrer and that with respect to the prior 2005 exchange he actually participated and negotiated it, but it varied sometimes. Sometimes, you know, it would be as simple as, you know, please go see this dentist, they're great. And other times it would be a much more active involvement because, of course, Mandelbaum was an accountant. But there was certainly no proffer that with respect to these 2008 transactions that he was their agent. And in fact, you know, Mr. Spurs said that on pages... I don't have the pinpoints. I believe it was in the 1900s. 1925 to 27, I think is what you said. That is not a proffer of Mandelbaum's testimony. That was Mr. Tabatabai's testimony and, you know, a discussion over objections. There never was a proffer of Mandelbaum's testimony, and it's particularly telling insofar as the Court's at all concerned about the Mendi allegation with respect to our rebuttal argument. It's particularly telling that Mandelbaum was on the defense witness list, and that's docket number 119. It's not in any of the excerpts. The Court did not categorically exclude Mandelbaum evidence. What he excluded was Maroca or Tabatabai potentially testifying about things that they didn't know, that Mr. Spurs couldn't lay a foundation for. The best way to get that in would have been to ask the victims, which they tried, and the victims said, no, we weren't aware of any of this. You know, your argument is completely contrary to your theory. You're saying now that it was specific as to these defendants as to whether or not they knew. But your whole case was based on this business of this was a fraud deal from the beginning, and it didn't make any difference on what was said to this defendant or that defendant. And if I see it right, T's testimony and the exhibits were not about these specific defendants, but in general what he was doing over all the years, he thought, was allowed under the statute and under the agreement. Now, I'm not saying that's right, but I'm saying that certainly was a general defense that should have been allowed, in my opinion, in this case. I've never seen a fraud case tried so strictly and rigorously against an individual who claims, and with witnesses beside him, that he didn't have any fraudulent intent. Judge Bright, if there was foundation for that, then it would have come in. The problem is that the foundation could not have been laid. Well, that's where I see it differently. I see that I'm over time, Judge Graber. You are. You may wrap up in a few seconds if you want to. Thank you. I know. I think I've covered the key points. And in light of our briefing, in light of our argument, we request that the Court affirm across the board in both cases. Thank you. Thank you, counsel. And we always consider all the arguments in the brief. So just because it hasn't been talked about today on both sides, we are fully aware of that. Thank you, Your Honor. Particularly our reply brief addressed many of the responsive parts, but I want to address factual statements just made by the prosecutor that are just factually not true. Laska and Vasquez both testified that Mandelbaum handled all of their communications. Laska's was from the 2005 exchange, and Vasquez's was from the 2008 exchange. Dababtabai never was face-to-face with either of those clients when they signed the exchange agreements. And the foundation for the Mandelbaum evidence included Mr. Dababtabai saying, I received this email, for example, that showed what he would have said, that showed me Mandelbaum was well aware that NFE funds were managed by NFE. Factually, this trial in a nutshell was a struggle, question by question, through virtually every witness to get in evidence that would have bore directly on Mr. Dababtabai's innocent state of mind. U.S. v. Thomas is the case that most controls these issues. And it's cited extensively in my brief, both for excluding other NFE client testimony and separately for excluding the Nicholas Klein testimony and all the other categories of evidence that were excluded. Thank you, counsel. We appreciate very much the arguments of all the counsel in these very challenging cases. Mr. Dababtabai's case or portion of this case is also now submitted.
judges: Bright, Graber, Ikuta